UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

MAR 1 6 2005

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

|   |   |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Criminal No. 05-0066 (PLF) |
| ) | |
| WALTER ANDERSON, ) | |
| ) | |
| Defendant. ) | |

## OPINION AND ORDER

This case is before the Court on defendant Walter Anderson's Motion to Impose Conditions of Release, filed on March 10, 2005. The issue of Mr. Anderson's pretrial detention was first considered by Magistrate Judge Alan Kay, who received briefing from the parties and heard testimony on February 28 and March 3, 2005. Upon consideration of the parties' arguments and the facts before him, and in accordance with the Bail Reform Act of 1984, 18 U.S.C. §§ 3141 *et seq.*, Magistrate Judge Kay concluded that the defendant posed a substantial risk of flight and found by a preponderance of the evidence "that there exist no conditions nor combination of conditions which would assure the return of this Defendant to all future court appearances," and granted the government's motion to detain Mr. Anderson pending trial. See Detention Memorandum at 6 (Mar. 7, 2005). Defendant subsequently filed the instant motion, and the Court heard the proffers and arguments of counsel on March 11, 2005.

The Court's review of the magistrate judge's decision is *de novo*; the Court is free to use in its analysis any evidence, proffers or rationale relied on by the magistrate judge, but may hear additional evidence or proffers and employ its own analysis. United States v. Karni, 298 F.



Supp.2d 129, 130 (D.D.C. 2004) (citing United States v. Hudspeth, 143 F. Supp. 2d 32, 35-36 (D.D.C. 2001)). Upon careful consideration of the indictment returned by the grand jury, the briefs and other papers submitted by the parties, the proceedings before Magistrate Judge Kay, Judge Kay's findings of fact and conclusions of law, and the evidence and proffers before this Court, the Court finds by a preponderance of the evidence that no condition or combination of conditions will reasonably assure the appearance of the defendant as required for trial. Accordingly, the Court will deny Mr. Anderson's motion to impose conditions of release and will order him detained pending trial.

## I. THE BAIL REFORM ACT

Our system of criminal justice embraces a strong presumption against detention. "'In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.'" United States v. Gloster, 969 F. Supp. 92, 96-97 (D.D.C. 1997) (quoting United States v. Salerno, 481 U.S. 739, 755 (1987)). The Bail Reform Act of 1984, 18 U.S.C. §§ 3141 *et seq.*, sets forth the limited circumstances in which a defendant may be so detained despite the presumption in favor of liberty. The Act provides, in pertinent part, that if a judicial officer finds by clear and convincing evidence that "no condition or combination of conditions will reasonably assure . . . the safety of any other person and the community, such judicial officer shall order the detention of the [defendant] before trial." 18 U.S.C. § 3142(e). The Act also provides for pretrial detention on the ground that no condition or combination of conditions will reasonably assure the appearance of the defendant as required. 18 U.S.C. § 3142(e). Where the government seeks pretrial detention on this basis, it has the burden of

establishing by a preponderance of the evidence that the defendant is likely to flee before trial if released. United States v. Simpkins, 826 F.2d 94, 96 (D.C. Cir. 1987) (citing United States v. Vortis, 785 F.2d 327, 328-29 (D.C. Cir.), cert. denied, 479 U.S. 841 (1986)); United States v. Westbrook, 780 F.2d 1185, 1188-89 (5th Cir. 1986). In a pretrial detention hearing conducted under the Bail Reform Act, both the government and the defendant may present evidence by way of proffer, rather than by presenting live testimony. United States v. Smith, 79 F.3d 1208, 1210 (D.C. Cir. 1996); United States v. Karni, 298 F. Supp.2d at 131.

Although in its initial motion for pretrial detention the government advanced the argument that Mr. Anderson would pose a risk to the community unless detained, Magistrate Judge Kay rejected that argument, and the government has not pursued it in proceedings before this Court.[1] Consequently, the Court's inquiry will focus on whether the government has shown by a preponderance of the evidence that there are no conditions of release that reasonably will assure defendant's appearance. In making this decision, the Court is to consider the available information concerning (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. See 18 U.S.C. § 3142(g).

---

[1] That argument focused on Mr. Anderson's alleged attempts to interfere with the grand jury investigation leading to his indictment in this case.

3

The most salient of these factors in Mr. Anderson's case are the nature and circumstances of the offense charged, and the defendant's history and characteristics. Magistrate Judge Kay focused on two these factors in considering Mr. Anderson's detention, and the Court finds it appropriate to do so as well.

## II.  DISCUSSION

### 1.  *Nature and Circumstances of Charged Offense*

Walter Anderson is a telecommunications executive and investment fund manager who enjoyed a great deal of success with investments in the telecommunications industry during the 1980s and 1990s. He has no history of violent criminal activity and, so far as the Court knows, no prior involvement in the criminal justice system beyond a conviction on misdemeanor drug possession charges in the District of Columbia Superior Court in 2004. The grand jury's 12-count indictment accuses Mr. Anderson of executing a sophisticated scheme to avoid payment of federal taxes on nearly half a billion dollars of investment income earned over a five-year period. The alleged scheme involved the formation of "shell" corporations in the British Virgin Islands and Panama, with the purpose of concealing from the United States government Mr. Anderson's ownership of investments in several telecommunications companies whose stock prices rose dramatically during the 1990s. The indictment alleges that as a result of these investment activities, Mr. Anderson owes approximately $210 million in back taxes to the federal and District of Columbia governments. The combined statutory maximum penalties for the federal crimes with which Mr. Anderson is charged is 23 years; he could face considerable additional time if convicted of the District of Columbia tax evasion charges. At 51 years old, Mr.

Anderson potentially could spend most of the remainder of his life in prison if convicted.

Count One of the indictment charges Mr. Anderson with corruptly obstructing, impeding and impairing the due administration of the Internal Revenue Laws, in violation of 26 U.S.C. § 7212(a), *inter alia*, by first failing to file tax returns for seven successive years (1987 to 1993) and then filing false returns, by refusing to cooperate with the IRS in its efforts to collect taxes from him, by creating offshore corporations in tax haven countries in a manner that concealed his ownership of assets and obstructed efforts by the IRS to monitor his financial transactions, by filing false and fraudulent returns for certain years, by concealing information from his accountants concerning his control over certain foreign bank accounts (leading to the preparation and filing of false tax returns), and by making false and misleading misrepresentations to his accountants for purposes of misleading the IRS in connection with an IRS audit. Counts Three through Six of the indictment charge tax evasion, in violation of 26 U.S.C. § 7201, in connection with tax years 1996, 1997, 1998, and 1999. Counts Seven through Twelve charge fraud in the first degree, in violation of 22 D.C. Code § 3221(a), in connection with the same tax years and tax year 1995, and the District of Columbia use tax.

The return of the indictment was preceded by the execution of two search warrants at Mr. Anderson's home and office, on March 19, 2002 and November 7, 2003, during which were seized approximately 90 boxes worth of documents and other evidence. See Government's Motion at 9; Transcript of Return on Bench Warrant and Arraignment Before the Honorable Alan Kay, United States Magistrate Judge (Feb. 28, 2005) ("Feb. 28 Transcr.") at 15-16. The grand jury also obtained thousands of other documents by subpoena. See id. at 53. On the basis of this evidence, the grand jury found probable cause to believe that Mr. Anderson

committed the charged offenses, which offenses, the government persuasively asserts, demonstrate substantial familiarity with the commercial and financial laws of other countries, sophistication in arranging international financial transactions and in moving money across borders, and a facility for concealing the existence and location of significant quantities of money and other assets. The behavior underlying these charged offenses clearly suggests that Mr. Anderson is a flight risk. See United States v. Townsend, 897 F.2d 989, 994 (9th Cir. 1990) (nature and circumstances of charged offense "weigh[ed] against bail" where accusations were "of sophisticated criminal conduct, whose successful completion required the ability to travel internationally, to adapt easily to foreign countries, and to move assets and individuals quickly from one country to another"). The gravity of the offenses and the potential prison term also create a considerable incentive for Mr. Anderson to avoid prosecution and the likelihood of imprisonment in the event of a conviction.

### 2. Defendant's History and Characteristics

Mr. Anderson himself demonstrates a number of characteristics that give the Court serious doubts about its ability to assure his appearance at trial through any combination of release conditions. Those most relevant to the Court are Mr. Anderson's unique ability to flee the jurisdiction and evade detection by the United States government by virtue of his substantial assets abroad, his connections overseas, and his use of aliases and false identities; strong circumstantial evidence of his clear interest in fleeing the jurisdiction and his intent to do so; his lack of ties to the District of Columbia; and his persistent deceitfulness (or, at the very least, lack of candor and good faith) in his dealings with the government.

Mr. Anderson appears to have the ability not only to flee the District of Columbia and the United States without detection, but also to live comfortably and evade capture in foreign jurisdictions. Mr. Anderson has traveled extensively, making at least 35 trips outside the United States since March 2003. See Government's Exhibit 59. He is fluent in Spanish. He has numerous international personal and business contacts, at least some of whom are likely to provide some assistance to Mr. Anderson (if not out of personal loyalty, then perhaps in the hope of financial gain) in the event he flees the country. Mr. Anderson also appears to have access to substantial assets overseas. He owns a 19,000 square-foot mansion in Spain purchased for more than five million euros. See Government's Exhibit 55; Feb. 28 Transcr. at 26. After his house was searched on March 19, 2002, and he became aware that he was the target of an IRS investigation, Mr. Anderson had numerous valuable pieces of artwork shipped from the United States to Switzerland, and has had some of them sold. There is no information about what happened to the proceeds. See Government's Exhibit 53; Feb. 28 Transcr. at 20, 26; Transcript of Continuation of Detention Hearing Before the Honorable Alan Kay, United States Magistrate Judge (Mar. 3, 2005) ("Mar. 3 Transcr.") at 9.; Government's Motion for Detention ("Detention Mot.") at 12-13. The government also has traced $20 million in cash to two Swiss bank accounts controlled by Mr. Anderson. See Feb. 28 Transcr. at 25.

Over the course of time Mr. Anderson has employed numerous aliases, some of which could facilitate his ability to travel and conduct business incognito. These aliases include Mark Roth, William Prospero, Robert Zzylch, Robert Zzyllick, R. Langer, Ragnor Danksjold, and Dr. Paul Anderson. See Detention Mot. at 8. Although there are reasons a person with legitimate privacy concerns might wish to conceal his identity on occasion, Mr. Anderson's

persistent use of such a wide variety of names suggests an interest in something beyond mere privacy protection. Indeed, the indictment alleges that defendant used the name Mark Roth not for innocent purposes but to facilitate the commission of crimes charged in the indictment. Mr. Anderson also is alleged to have employed anonymous foreign and American mailboxes and mail forwarding services to conduct and conceal business transactions, as well as false addresses in Florida and Virginia for the purpose of evading payment of various taxes and regulatory fees. See Detention Mot. at 8.

Of great significance to the Court in finding by a preponderance of the evidence that Mr. Anderson has both the means and the intention to evade prosecution are materials seized in the searches of Mr. Anderson's residence in March 2002 and November 2003. Among other documents, those searches uncovered a variety of materials with little plausible purpose beyond Mr. Anderson's creation and use of false identities and identification for a variety of purposes, including travel abroad while concealing his true identity.

In Mr. Anderson's residence were found blank forms for the creation of a United Nations-issued "International Driving Permit" and a "private investigator" identification card; a "certificate of baptism" from the Military Ordinariate of the United States of America, with identifying information whited out; and numerous different passport photos. See Government's Exhibits 11, 12, 10. Mr. Anderson also was in possession of an identity document, bearing Mr. Anderson's photograph and the name "William Prospero," that appears to be a forgery based on a document (also in Mr. Anderson's possession) issued to a female acquaintance of Mr. Anderson,

Jeannine Benedicie. See Government's Exhibit 8; Feb. 28 Transcr. at 23-24.[2] Ms. Benedicie's grand jury testimony corroborates this impression. See Feb. 28 Transcr. at 24. Even standing alone, Mr. Anderson's possession of such false identification documents and materials necessary for the creation of further false identification might be enough to support a finding that Mr. Anderson presents a serious flight risk. See United States v. Hollender, 162 F. Supp. 2d 261, 264-65 (S.D.N.Y. 2001).

Also found in Mr. Anderson's home, however, was a passport from "British Guiana" issued to "Dr. Paul Anderson," residing at "2012 Nevada NW" in Washington, D.C, with Walter Anderson's photograph on it. See Government's Exhibit 7. The defense claims that this is a legal "camouflage passport" acquired by Mr. Anderson to conceal his United States citizenship in the event he was ever abducted by terrorists, that "British Guiana" now is a non-existent country (British Guiana became the Cooperative Republic of Guyana in 1966), and that Mr. Anderson could not actually travel on this passport. This may be the case, but it is also true that such "camouflage passports" may be used as false identification in bank transactions in other countries, where bank employees are not generally trained to spot false passports.

Even more troublesome questions are raised by the numerous books and pamphlets, seized in the searches of Mr. Anderson's home and office, that describe means of creating and obtaining false identification for purposes of concealment. See Government's

---

[2] The two documents are in the same format, and have identical police stamps and signatures. The personal information on each is different and appears in a different typeface. The document carrying Mr. Anderson's picture says that it was issued to "William Prospero," who was born and resides in Paris. Based on the copies of these documents proffered by the government, they appear to be passports or other forms of identification issued by the French government.

Exhibit 14. Among the publications found were "I.D. by Mail," "Reborn Overseas: Identity Building in Europe, Australia and New Zealand," "Methods of Disguise," "The Paper Trip I: For a New You Through New ID," "Poof! How to Disappear and Create a New Identity," "The ID Forger: Homemade Birth Certificates & Other Documents Explained," "Who Are You? The Encyclopedia of Personal Identification" (the blurb reads "How to steal anyone's identity . . . where to get a 'real' birth certificate . . . how to open an untraceable offshore ATM account"); and "Bulletproof privacy: how to live hidden, happy, and free!" See id.; Government's Exhibit 15. The table of contents for the latter publication contains such section headings as "Using fake paperwork," "Privacy requires the spinning of yarns," "Work out your story in advance," "Private Travel," "Getting around overseas," and "Tax avoidance is legal" (including the subheading "The necessity of foreign entities"). The last three of these works ("The ID Forger," "Bulletproof Privacy," and "Who Are You?") appear to have been purchased by Mr. Anderson in April or May of 2002, *after* the execution of the government's first search warrant, and thus after Mr. Anderson had notice of the pending investigation. See Feb. 28 Transcr. at 20; Government's Exhibit 15.

    The defense argues that possession of these "how-to" books is "insufficient to necessarily demonstrate any mastery of the creation of false identities." See Opp. at 13. While they do not demonstrate Mr. Anderson's *mastery* of these techniques, they do demonstrate conclusively an intense interest not just in personal privacy but in personal concealment through the creation of false identities, and the fact that Mr. Anderson has in the past at least engaged in the rudiments of identity creation. Given Mr. Anderson's intelligence and resourcefulness, and the considerable resources at his disposal, the Court is confident that he could plan and execute a

scheme of flight and evasion with a high probability of success. The implausibility of an innocent explanation for all the material seized in Mr. Anderson's possession further supports a finding that he had not only the ability but the interest and intent to flee. See United States v. Nichols, 897 F. Supp. 542, 548-49 (W.D. Okla. 1995) ("Although there are separate plausible innocent explanations for many of the individual items or pieces of the circumstantial evidence that Defendant committed or aided and abetted the commission of the crime charged, when the circumstantial evidence in its totality or collectively is considered, the weight of the evidence is great[.]") (finding by clear and convincing evidence that no condition or combination of conditions could reasonable assure safety of community if defendant were released).

Other materials seized in the March 2002 search corroborate the fact that Mr. Anderson's subsequent transfer of assets overseas (the artwork and the 20 million dollars in cash) was for illicit purposes, to shield assets from the authorities and/or to plan for a life after the investigation in another part of the world. Among the documents seized were books and articles with such titles as "Complete Guide to Financial Privacy," "Complete Guide to Offshore Money Havens," "Reaching offshore assets (it won't be easy)," "Capturing Cargo Adrift - Reaching Offshore Assets," and "Deck Chair on the Titanic or a Veranda on the QE2: Your Financial Journey - the Choice is Yours." See Detention Mot. at 12 & n.5.

The government further argues that Mr. Anderson has few ties to the District of Columbia, or even to the United States, and thus has little personal incentive not to flee. Mr. Anderson is not married and has no known children, he owns no residence here, and most of his business is conducted overseas. See Detention Mot. at 13. As the defense points out, however, his mother and stepfather do live in the area, and Mr. Anderson has at least maintained a

residence in the District of Columbia for many years. While the Court does not discount the significance of Mr. Anderson's relationship with his mother and stepfather, it must be acknowledged that leaving the country under these conditions would entail less of a sacrifice for Mr. Anderson than it would if he had a spouse or minor children here. In combination with the fact the Mr. Anderson actually maintains at least one residence abroad, has many social ties abroad (including some romantic involvements), and has at least considered applying for citizenship in another country (Grenada), see Detention Mot. at 10-11, Mr. Anderson's dearth of personal ties to this country and to this area must be considered to weigh as a significant factor in determining whether release on any conditions would reasonably assure his appearance for trial. See 18 U.S.C. § 3142(g)(3)(A).

Less conclusive than the aforementioned factors, but nonetheless disturbing, is Mr. Anderson's historical unwillingness to be forthright in his dealings with government officials and the Court, which has on occasions shaded into outright deception. For example, when Mr. Anderson was ordered to appear before the grand jury investigating him to provide a handwriting exemplar, his attorney moved for an emergency continuance based on the fact that Mr. Anderson was, as was represented to Chief Judge Hogan, traveling in Europe. In reality, Mr. Anderson was in the British Virgin Islands, forming another corporate entity allegedly in an effort to obstruct the grand jury investigation. See Detention Mot. at 17-18. The defense responds that Mr. Anderson traveled both to the British Virgin Islands and to Europe on that trip, and thus the representations made to Chief Judge Hogan were, strictly speaking, true. At best, the representations to Judge Hogan were only half true, and the clear effect of these statements was to give the Chief Judge a false sense of where Mr. Anderson was and why he was there, and to

prevent Judge Hogan from discovering information that might have cast suspicion on Mr. Anderson.

Mr. Anderson's application for a new passport after his was seized in the March 2002 search of his home also displays a disturbing lack of candor. See Mar. 3 Transcr. at 63. In response to the question "How was the passport lost or stolen?" Anderson replied: "Documents were removed from my house. Passport was part of these documents." When asked on the application form what efforts he had made to recover the passport, Anderson's reply was "tried to contact the person with the document." While Mr. Anderson avoided making any explicitly false statements, his clear intent was to create the false impression that his passport was simply lost or stolen, rather than seized by the government in a search of his home. As Magistrate Judge Kay pointed out at the March 3, 2005 detention hearing, Mr. Anderson is far too intelligent not to have understood the likely effects of his half-truths: "[Y]ou well know that if you put this was 'seized pursuant to a search warrant,' that the likelihood of them issuing another passport would have been remote at best." Mar. 3 Transcr. at 63.

The Court does not agree, however, that all the instances cited by the government of Mr. Anderson's resistance to the grand jury investigation should be held against him. For example, the Court notes that it is perfectly legitimate in some circumstances (and crucial to the integrity of the legal process) to resist the production of documents to the government when there are colorable legal grounds, such as attorney-client privilege, for doing so. See also In re Sealed Case (Hakim), 832 F.2d 1268, 1272-74 & n.3 (D.C. Cir. 1987). Nonetheless, at least some of Mr. Anderson's conduct appears to have crossed the line between legitimate and illegitimate interference with the mechanics of government and the processes of the grand jury and the Court.

The defense has submitted numerous letters attesting to Mr. Anderson's good character and honesty from people who have known him in a personal and a professional capacity. They detail Mr. Anderson's commitment to helping others, and describe him as "a person with the highest ethical and moral standards," "genuine, respectful, truthful, and helpful," and "loyal, respectable, and trustworthy." Like any character witness testimony, however, the opinion of such a person is just that, an opinion – an opinion all too often based on incomplete and episodic information. Given Mr. Anderson's alleged misrepresentations to his own accountants and his demonstrated willingness to deceive the government and the Chief Judge, his alleged honesty and integrity in personal and business dealings give the Court no confidence that Mr. Anderson has been forthright with the very friends and associates who vouch for him, or that he will be forthright in his future dealings with the government or this Court.

The defense has emphasized in briefs and at oral argument that Mr. Anderson has left the country and returned many times during the pendency of the government's investigation into his business and investment activities. His willingness to remain in and repeatedly return to the United States despite the risk of indictment, the defense argues, indicates that Mr. Anderson wishes to remain here to defend his good name and reputation against attack in the criminal proceeding, even if it means, ultimately, risking his freedom. The Court does not find this argument convincing. As Magistrate Judge Kay pointed out in Mr. Anderson's earlier detention hearing, a pre-indictment investigation and a post-indictment trial are two very different things: "When a person has been told by the Judge that they're to be taken to the gallows, it has a focusing impact on them." Mar. 3 Transcr. at 64. Despite Mr. Anderson's own statements before Magistrate Judge Kay that he "knew for sure there would be an indictment," the Court

14

finds it at least as rational to conclude, as the government has argued, that Mr. Anderson either did not believe there would ever be an indictment, believed that he would have advance notice of any indictment, or believed (as Mr. Anderson admitted) that in the event of an indictment he would be allowed to "appear voluntarily for an arraignment in a civilized way," id. at 60, in which case he would (if already prepared to flee) have ample time to decamp for another jurisdiction.

The defense also points to Mr. Anderson's history of appearing when required in recent civil and criminal proceedings against him, and of compliance with the conditions of his unsupervised release following his conviction on misdemeanor drug charges, as demonstrating his "ability to honor his court dates and comply with court-ordered conditions of release." See Defendant Walter Anderson's Motion to Impose Conditions of Release at 6. The Court is not, however, concerned with Mr. Anderson's *ability* to comply with any conditions of release. Mr. Anderson clearly is sophisticated and responsible enough to make court appearances and comply with conditions right up to the point at which he concludes that it is no longer in his interest to do so. He certainly understood that failing to make appearances or to comply with his conditions of release in his misdemeanor case would have led to increased government scrutiny in this case and restrictions on his freedom of action. The Court is concerned that Mr. Anderson may not be so willing to comply with the orders of court now that both the potential benefits of fleeing the jurisdiction and the consequences of remaining are so much greater. The Court finds by a preponderance of the evidence that Mr. Anderson poses a most serious risk of flight.

*3. Conditions of Release*

Having found that Mr. Anderson presents a serious risk of flight, the Court must determine whether there is any "condition or combination of conditions [that] will reasonably assure the appearance of the [defendant] as required[.]" 18 U.S.C. § 3142(e). At the Court's request, defense counsel suggested by letter of March 11, 2005, a number of conditions of release that they argue would ensure Mr. Anderson's appearance for trial. Among those proposed conditions are: (1) requiring the surrender of Mr. Anderson's passport or any other travel documents; (2) requiring Mr. Anderson to provide a general waiver of extradition; (3) prohibiting Mr. Anderson from seeking to obtain replacement travel documents, from traveling outside the District of Columbia without consent of the Court, from changing his address or telephone number without informing the Court, and from failing to appear for any Court proceedings; (4) requiring Mr. Anderson to submit to some form of monitoring regime, possibly including electronic monitoring; and (5) requiring that Mr. Anderson's parents post their $500,000 home as security for Mr. Anderson's pretrial release. Given the aforementioned risks of flight, the Court finds that none of these conditions, separately or in combination, are sufficient to provide reasonable assurance of Mr. Anderson's presence at future proceedings.

The behavioral prohibitions proposed are essentially unenforceable promises not to engage in behavior that might facilitate the defendant's flight from this jurisdiction or from the United States and, standing alone, provide no assurance that Mr. Anderson will remain here for trial. The surrender of travel documents likewise would present little impediment to flight given Mr. Anderson's already-discussed capacity to obtain or fabricate replacements. A general waiver of extradition would be effective only if Mr. Anderson were to seek refuge in a country whose

laws recognized such a waiver, and only if Mr. Anderson were actually apprehended in that country.

The Court also is not confident that any monitoring system could effectively prevent Mr. Anderson from leaving the jurisdiction. Weekly or even daily call-ins or visits to Pretrial Services would still allow the defendant a day's head-start on flight from the United States. Conventional electronic monitoring also would only apprise authorities of whether Mr. Anderson was in or out of his home, and would likewise give him ample lead time if he wished to flee. See United States v. Townsend, 897 F.2d at 994-95 ("Nor does the wearing of an electronic device offer assurance against flight occurring before measures can be taken to prevent a detected departure from the jurisdiction."). Furthermore, the Court is concerned that, given the many months (perhaps up to a year) that will elapse before he is brought to trial, Mr. Anderson could frustrate even a GPS-based monitoring system, at least for a period of time sufficient to allow him to flee.

Finally, the Court finds that the posting of Mr. Anderson's parents' $500,000 home as security would not provide a reasonable assurance of Mr. Anderson's appearance at trial. There is reason to believe that Mr. Anderson has access to financial resources far in excess of the value of his parents' house, with which he might provide for them (if he has not already) in the event that their house is seized. The government, in its letter to the Court of March 11, 2005, mentions both 20 million dollars Mr. Anderson apparently deposited into a Swiss bank account and Mr. Anderson's recent interview with *The Washington Post* in which statements made by Mr. Anderson suggest that he controls 30 to 50 million dollars in funds located overseas. See David S. Hilzenrath, Carol Loenig, and Yuki Noguchi, Tax Case Defendant Says Money Was to

do Good, THE WASHINGTON POST (Mar. 4, 2005).[3] Moreover, it is not unreasonable to expect that someone's mother, even if she were confident that he would be likely to flee, might willingly post her own home as security to protect her son from a potentially lengthy prison term.

### III. CONCLUSION

Deciding whether an individual poses a substantial risk of flight before trial is a difficult exercise in probability analysis. Nonetheless, in navigating the uncertain terrain of human behavior, the Court is not without guideposts. In Magistrate Judge Facciola's words, "what is past is prologue," and the Court can look to the defendant's past behavior for some indication of what he will do in the future. See United States v. Battle, 59 F. Supp.2d 17, 20 (D.D.C. 1999). The Court recognizes Mr. Anderson's history of appearing for court when required, in both civil and criminal proceedings. On the other hand, the gravity of the situation he now is presented with far exceeds any that Mr. Anderson has faced before, and his incentive to flee the jurisdiction is concomitantly greater. The material seized from his home and the assets that already were overseas, as well as those that were moved overseas after Mr. Anderson learned he was the target of this investigation, indicate that Mr. Anderson is fully prepared to flee the jurisdiction whenever he concludes that the time is propitious. Moreover, Mr. Anderson's

---

[3] The article states that in 1997, Mr. Anderson created the Foundation for the International Non-Governmental Development of Space ("FINDS") and endowed it with millions of dollars. FINDS does not currently have not-for-profit status under IRS rules. Mr. Anderson stated, according to the *Washington Post*, that the value of FINDS's assets is approximately 30 to 50 million dollars, but did not state that he controls the disposition of those assets. Mr. Anderson's endowment of FINDS is not part of the behavior underlying the offenses charged in the indictment.

past behavior also demonstrates a troubling habit of dealing with the government and the courts in evasions and half-truths.

The nature and circumstances of the offense with which Mr. Anderson is charged demonstrate not only his considerable incentive to flee and evade prosecution, but also his considerable experience in conducting business abroad and in moving money and assets across borders without detection. Moreover, Mr. Anderson's personal history and characteristics demonstrate his skill and indisputable interest in concealing his identity and evading the notice of authorities. On the evidence before it, the Court finds that Mr. Anderson has the financial wherewithal to execute any plans for flight, as well as to live abroad and escape detection.

The evidence before the Court and the arguments and proffers of the parties give the Court ample reason to doubt that Mr. Anderson would appear for trial if released, or that any set of conditions could be imposed that would reasonably ensure his continued appearance. In view of the foregoing, the Court finds by a preponderance of the evidence that there is no condition or combination of conditions that will reasonably assure the appearance of the defendant as required by this Court. Accordingly, it is hereby

ORDERED that Defendant Walter Anderson's Motion to Impose Conditions of Release is DENIED.

SO ORDERED.

/s/ Paul L. Friedman
PAUL L. FRIEDMAN
United States District Judge

DATE: 3/16/05