UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 05-0066 (PLF) |
| | ) | |
| WALTER ANDERSON, | ) | |
| | ) | |
| Defendant. | ) | |

OPINION AND ORDER

This matter is before the Court on defendant's second motion for reconsideration of the Court's March 16, 2005 Opinion and Order denying defendant's motion to impose conditions of release. For the reasons set forth below, the Court denies defendant's motion.

I. BACKGROUND

On March 16, 2005, the Court issued an Opinion and Order denying defendant Walter Anderson's Motion to Impose Conditions of Release. See Opinion and Order (March 16, 2005) ("March 16 Opinion"). Upon careful consideration of the indictment returned by the grand jury, the briefs and other papers submitted by the parties, bond proceedings before Magistrate Judge Kay, Judge Kay's findings of fact and conclusions of law, and the evidence and proffers before this Court, as well as the legal standards governing pretrial detention under the Bail Reform Act of 1984, 18 U.S.C. §§ 3141, et seq. ("BRA"), the Court found by a preponderance of the evidence that Mr. Anderson posed a serious risk of flight and that no condition or combination of conditions would reasonably assure his appearance as required for trial.

On March 21, 2005, defendant filed a motion for reconsideration proposing additional conditions of release, which the Court denied on April 1, 2005, primarily on the grounds that defendant's proposal did not constitute a comprehensive and workable plan for ensuring his appearance at trial.  See Memorandum Opinion and Order (April 1, 2005).

On May 2, 2005, defendant filed a second motion for reconsideration, challenging the evidence previously put forth by the government and proposing an elaborate plan for confining Mr. Anderson to his home while awaiting trial.  The motion was fully briefed and the parties presented evidence and oral argument on May 17 and 31, and June 1 and 3, 2005.  The government presented the testimony of IRS Special Agent Matthew Kutz; Daniel Litt, Esq. of Dickstein Shapiro; John William Little, secretary of the Board of Directors of Mr. Anderson's condominium association; and Donald Howard Paul, internal affairs investigator at the Correctional Treatment Facility in Washington, D.C.  Defendant called Sheldon Werb, a friend and business associate of Mr. Anderson; and Bart M. Schwartz, a partner in the firm of Nardello Schwartz, which had developed the plan for Mr. Anderson's home confinement.

On August 1, 2005, Chadbourne & Parke moved for leave to withdraw as Anderson's counsel on the basis that Anderson was unable to pay his legal bills.  They represented that he also could no longer pay for the Nardello Schwartz release plan.  At a status conference on August 8, 2005, Chadbourne & Parke further represented that they would soon file on Anderson's behalf a motion for the appointment of counsel under the Criminal Justice Act, 18 U.S.C. § 3006A.

II.  DISCUSSION

Although defendant has succeeded in showing, through the testimony and other evidence presented in briefing and during the four-day hearing, that the government's factual assertions in prior proceedings in this case are in some respects not as well-substantiated as they had once appeared, the relevant facts remain substantially unchanged.  The evidence now before the Court still shows that Mr. Anderson presents a substantial risk of flight and that none of the proposed conditions or combination of conditions would reasonably assure his appearance as required for trial.[1]

The standards for pretrial confinement under the Bail Reform Act are set forth in greater detail in the the Court's March 16, 2005 Opinion and Order.  See March 16 Opinion at 2-3.  In brief, however, the BRA provides for pretrial detention if the government establishes by a preponderance of the evidence that the defendant is likely to flee before trial if released and that no condition or combination of conditions will reasonably assure the appearance of the defendant as required.  See 18 U.S.C. § 3142(e); United States v. Simpkins, 826 F.2d 94, 96 (D.C. Cir. 1987) (citing United States v. Vortis, 785 F.2d 327, 328-29 (D.C. Cir.), cert. denied, 479 U.S. 841 (1986)).  In making this decision, the Court is to consider the available information concerning (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release.  See 18 U.S.C. § 3142(g).

---

[1] The Nardello Schwartz plan is not considered in this assessment, as defendant has represented that it is no longer a financially viable option.

None of the evidence presented in connection with defendant's recent motion presents a different picture either of the nature and circumstances of the offense charged or of the weight of the evidence against Mr. Anderson.  It is still the case that a grand jury returned an indictment charging Mr. Anderson with corruptly obstructing, impeding and impairing the due administration of the Internal Revenue Laws in violation of 26 U.S.C. § 7212(a), and with evasion of federal income taxes in violation of 26 U.S.C. § 7201, all in relation to Anderson's alleged execution of a sophisticated scheme to avoid payment of federal taxes on nearly half a billion dollars of investment income earned over a five-year period.  These federal offenses carry a maximum combined penalty of 23 years.  The indictment also charges Anderson with six D.C. Code counts of fraud in the first degree.  Because these facts have not changed, and because the Court's denial of defendant's earlier motion for pretrial release was not predicated on a finding of dangerousness, the Court now considers only whether the newly introduced evidence so changes the Court's assessment of defendant's history and characteristics that reconsideration of the Court's finding that defendant poses a substantial risk of flight is warranted.

The evidence now before the Court still indicates that Mr. Anderson has the motive and inclination to flee the country if afforded the opportunity.  Among the facts on which the Court relied in making a similar finding in its March 16, 2005 Opinion and Order was defendant's habitual use of multiple false identities.  Although defendant argues that some of these aliases have been used solely to protect his privacy and have never appeared on any false identification ("Robert Zzylch," for example, appears to have been used only for the purpose of obtaining telephone service in Washington, D.C.), this simply is not the case with all of Mr. Anderson's aliases.  See Transcript of Motions Hearing (May 31, 2005) ("May 31 Transcr.") at

4

32-35. The alias "William Prospero," for example, though used (according to the evidence available) only to obtain utility service for a property owned by Gold & Appel, nonetheless appeared with Anderson's photograph on a forged visa document. See id. at 35-38. Even assuming that the use of a false identity to obtain utility service for a corporate property is an "innocent" act not relevant to whether Anderson presents a flight risk, the Court nonetheless finds it unlikely that Anderson would go to the trouble of forging an international travel document for that purpose alone. It is more reasonable to infer that a potential intended use of this forged travel document is indeed travel.

       The Court also found in its March 16 Opinion and Order that other materials seized by the government pursuant to search warrants executed on March 19, 2002 and November 7, 2003 indicate Anderson's strong interest in leaving the country and establishing an identity and a residence overseas. See March 16 Opinion at 8-11. Despite the defendant's attempts to "contextualize" some of these documents and to show that they reflect nothing more than a legitimate personal or professional interest in such matters, some of these materials cannot be explained away. For example, the Court is unable to conjure up an innocent use for the aforementioned identity document bearing Mr. Anderson's photograph and the name "William Prospero." See March 16 Opinion at 8-9; Gov't Ex. 8; Transcript of Motions Hearing (February 28, 2005) at 23-24. And defendant offers no explanation for the blank forms for the creation of a United Nations-issued "International Driving Permit" and "private investigator" identification cards, or for the blank "certificate of baptism" from the Military Ordinariate of the United States of America found in Mr. Anderson's residence. See Gov't Ex. 11, 12.

The books seized in the execution of search warrants on Mr. Anderson's premises also remain troubling.  Defendant attempts to offer alternative explanations for Mr. Anderson's possession of some of these books, stating that Mr. Anderson is "understandably intrigu[ed]" by books about persons living underground and that he reads books on identity theft and "the games people play with foreign corporations" because he wants to protect himself from the activities of such persons.  See Walter Anderson's Second Brief in Support of Reconsideration of His Motion to Impose Conditions of Release ("2d Mot. Reconsid.") at 21.  That may be true with respect to some of these books.  Such explanations ring hollow, however, with regard to the several books ordered by Mr. Anderson immediately *after* the execution of the first search warrant ("Stolen Lives," "The ID Forger," "Bulletproof Privacy," and "Who Are You?"), which appear more akin to instruction manuals than to the historical accounts of outlaws, Jewish families who avoided Nazi persecution during World War II, or Nazis who fled to Latin America that Mr. Anderson enjoys.  See 2d Mot. Reconsid. at 21.  A far more plausible explanation is that Anderson's interest in these books relates to his interest in leaving the United States and assuming another identity abroad.  See Gov't Ex. 15.

On the issue of Mr. Anderson's inclination to flee the country, defendant took pains to convey Mr. Anderson's character as "a fighter," more likely to stand and seek vindication in court than to flee prosecution.  See Transcript of Motions Hearing (June 3, 2005) ("June 3 Transcr.") at 17-23.  In support of this proposition, defendant adduced evidence of Mr. Anderson's past litigation behavior and involvement in public controversies and elicited testimony about Anderson's character from a business associate as well as from Agent Kutz, who has been involved in Mr. Anderson's case for several years.  This "fight," however, is

fundamentally different from any defendant has before faced, and the Court is far from convinced that, given the choice, Mr. Anderson would risk his freedom for the opportunity to wage this conflict in the government's chosen forum.  As Magistrate Judge Kay said in Mr. Anderson's initial detention hearing, "When a person has been told by the Judge that they're to be taken to the gallows, it has a focusing impact on them."  Transcript of Continuation of Detention Hearing Before the Honorable Alan Kay, United States Magistrate Judge (Mar. 3, 2005) at 64.

The evidence and testimony adduced by the parties also does not lead the Court to question its earlier finding that Anderson has the wherewithal to flee the country and escape detection.  Mr. Anderson's sophistication and extensive travel experience, as discussed in the Court's prior Opinion, see March 16 Opinion at 7, are not in dispute.  Defendant does challenge, however, the government's contention that Mr. Anderson has access to large sums of money overseas, arguing that the government has misstated the facts regarding Swiss bank accounts into which substantial sums of Gold & Appel money had been transferred.  See 2d Mot. Reconsid. at 10-13.

There is, admittedly, considerable uncertainty regarding the *extent* of Mr. Anderson's access to financial resources overseas, owing primarily to the fact that Anderson has in the past chosen to locate such assets in accounts in Switzerland, the Cayman Islands, and other jurisdictions with strong protections regarding the disclosure of financial information.  Certain facts, however, are clear.

From 1998 to 2000, approximately $20.5 million was wired from a Gold & Appel account in the Channel Islands to Credit Suisse Bank accounts in Geneva.  See Gov't Ex. 2-24.  By 2003, those accounts had been closed and the money transferred elsewhere.  See Gov't Ex.

2-27. According to Swiss authorities, the holder of those accounts (if not their beneficial owner) is Silvia Rubio de Molina, a personal and business acquaintance of Mr. Anderson. See Govt Ex. 2-33. In a December 2, 2004 interview with IRS agents, Ms. Rubio denied that she was the holder of those accounts. See Gov't Ex. 2-35. Swiss authorities have been unable to account for this discrepancy. See Gov't Ex. 2-36. Agent Kutz testified to his belief that Mr. Anderson is employing Rubio as a "nominee" – an individual designated to hold an account or position in name only, while Mr. Anderson maintains actual control – as Anderson has previously done with other individuals in other contexts. See May 31 Transcr. at 107-08. Uncertainty as to the exact location of the funds notwithstanding, it is clear that more than $20 million remains unaccounted for, and it is likely that those funds are under the control either of Mr. Anderson or of a close friend and business associate.

      The government also presented evidence of three accounts with Barclay's Bank in the Channel Islands in Mr. Anderson's name or in the name of Gold & Appel. Although the Anderson accounts appear to have been closed, the Gold & Appel account was still open as of July 2004. See May 31 Transcr. at 56-59. More importantly, the disposition of funds from those accounts is unknown. Agent Kutz also testified, and the government presented evidence to show, that after the first search warrant was executed in March 2002, Mr. Anderson formed additional corporate entities and opened or attempted to open additional bank accounts in Cyprus and the Cayman Islands (although the amount of funds in those accounts is unclear). See May 31 Transcr. at 105-06; Gov't Ex. 2-42.

      Documentary evidence also shows that in 2001, more than $9 million worth of Gold & Appel assets in the United States were liquidated and transferred out of the country. See

Gov't Ex. 93. Daniel Litt, Esq., an attorney involved in civil litigation in which a $27 million judgment was entered against Gold & Appel, testified to his firm's inability to locate those assets, suggesting that they still exist and may be accessible to Mr. Anderson. See May 31 Transcr. at 135, 140-42.

The upshot of this evidence and testimony is that millions of dollars in assets controlled at one time by Mr. Anderson or his corporations remain unaccounted for overseas, and that a significant probability exists that Mr. Anderson therefore has control over assets which could facilitate his flight from prosecution.

There is also the issue of Mr. Anderson's passports. Although the government has not demonstrated that Mr. Anderson's "British Guyana" passport (which defendant characterizes as a "camouflage passport") has been used for any illicit purpose, see May 31 Transcr. at 25-27, one genuine passport in Walter Anderson's name remains definitely unaccounted for.[2] On December 15, 2003, Mr. Anderson applied to the State Department for a new passport, reporting that his previous one had been lost when he "cleaned out his home office between November 18th and December 1st" – just a few weeks after the execution of the second search warrant on November 7, 2003. See May 31 Transcr. at 94-99; Gov't Ex. 2-39. Although the Court understands that there is no way to prove (short of recovering the passport) that the

---

[2] The government claims that there are *two* validly issued passports now unaccounted for. See June 3 Transcr. at 8. Mr. Anderson did apply for another replacement passport on September 1, 2004, reporting that his passport "was washed by mistake and is no longer usable." See May 31 Transcr. at 95-96; Gov't Ex. 2-40. Agent Kutz was unaware, however, of whether that passport was still in Mr. Anderson's possession or had been turned in with the passport application. See May 31 Transcr. at 132-33. In cross-examining Agent Kutz defense counsel suggested the latter to be true; however, defendant introduced no evidence to that effect. See id.

passport was indeed lost, the timing of the application is highly suspicious.  Moreover, it is difficult to imagine that an individual of Mr. Anderson's sophistication – and one as dependent on foreign travel for his livelihood – would simply discard his passport with his office trash.  If Mr. Anderson indeed retained the passport, it would greatly facilitate any attempt to leave the United States.

Finally, a safe deposit box or boxes opened abroad by Mr. Anderson could afford him additional aid in flight.[3]  Although defendant has produced an affidavit by a third party attesting to the fact that one of those boxes contains no cash or valuables, but only business documents, see Ex. F to 2d Mot. Reconsid., in Mr. Anderson's case "business documents" of no obvious value – bearer shares in a corporation, for example – could very easily allow him access to financial resources located abroad.

In light of the evidence that Mr. Anderson has both the motive and the means to flee prosecution, the Court again finds by a preponderance of the evidence that Mr. Anderson presents a severe risk of flight.

### III.  CONCLUSION

The Court finds by a preponderance of the evidence that Mr. Anderson presents a substantial risk of flight.  Notwithstanding the possible merits of the Nardello Schwartz plan as designed, it now appears that Mr. Anderson lacks the resources to fund that plan or any plan of

---

[3] In closing argument the government claimed that it "now knows about two" safe deposit boxes in Mr. Anderson's name; however, Agent Kutz testified only about one of those boxes.

similar expense and complexity.[4]  Any complex, technologically-intensive plan is essentially unworkable unless and until Mr. Anderson can amass the funds to pay for it.  Although the Court cannot yet ascertain the extent of Mr. Anderson's indigence, it is clear for this reason that there exists no workable set of release conditions that can reasonably assure Mr. Anderson's appearance at trial.  The Court therefore denies defendant's second motion for reconsideration of his pretrial release.

   Accordingly, it is hereby

   ORDERED that [36] Walter Anderson's second motion for reconsideration of his motion to impose conditions of release is DENIED.

   SO ORDERED.

/s/_____
PAUL L. FRIEDMAN
United States District Judge

DATE: August 10, 2005

---

[4] On cross-examination, Bart Schwartz of Nardello Schwartz estimated the cost of the plan to be about $180,000 a month, or $2.16 million a year.  See Transcript of Motions Hearing (June 1, 2005) at 39.  Nardello Schwartz would require the entire sum to be paid in advance.  See id. at 39-40.